GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA, SBN 254433
  dmanthripragada@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

GIBSON, DUNN & CRUTCHER LLP
MICHELE L. MARYOTT, SBN 191993
  mmaryott@gibsondunn.com
3161 Michelson Drive
Irvine, CA  92612-4412
Telephone: 949.451.3800
Facsimile:   949.451.4220

Attorneys for Defendant POSTMATES INC.

LICHTEN & LISS-RIORDAN, P.C.
SHANNON LISS-RIORDAN, SBN 310719
  sliss@llrlaw.com
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone: (617) 994-5800
Facsimile: (617) 994-5801

Attorneys for Plaintiff Joshua Albert

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA ALBERT,<br><br>          Plaintiff,<br><br>    v.<br><br>POSTMATES INC.,<br><br>          Defendant. | CASE NO. 3:18-cv-07592-JCS<br><br>**JOINT STATUS REPORT**<br><br>Action Filed:  May 8, 2018<br>Trial Date:  None Set |

Plaintiff Joshua Albert ("Plaintiff" or "Albert") and Defendant Postmates Inc. ("Defendant" or "Postmates") (collectively, "the parties"), by and through their respective counsel of record, hereby submit this Joint Status Report regarding the status of their settlement.  The parties state as follows:

1.      On June 16, 2020, the trial court in *Rimler v. Postmates, Inc.* No. CGC-18-567868 (S.F. Super. Ct.) denied preliminary approval of the class settlement "without prejudice."  Ex. A at 2.  The court "encourage[d] the parties to continue settlement negotiations in hopes that they are able to present another agreement for preliminary approval."  *Id.* at 12.

2.      The parties intend to continue settlement negotiations.

3.      The parties will keep the Court apprised of the status of settlement approval in *Rimler*.

Dated: July 9, 2020

GIBSON, DUNN & CRUTCHER LLP

By:   _/s/ Theane Evangelis_
       Theane Evangelis

Attorneys for Defendant POSTMATES INC.

Dated: July 9, 2020

LICHTEN & LISS-RIORDAN, P.C.

By:   _/s/ Shannon Liss-Riordan_
       Shannon Liss-Riordan

Attorneys for Plaintiff Joshua Albert

## ECF ATTESTATION

I, Theane Evangelis, hereby attest that concurrence in the filing of this document has been obtained from the above signatories.

Dated: July 9, 2020

GIBSON, DUNN & CRUTCHER LLP

By:   _/s/ Theane Evangelis_
       Theane Evangelis

# EXHIBIT A

1

2

3

4

5

6

7

8

9

10

F I L E D
San Francisco County Superior Court

JUN 1 7 2020

CLERK OF THE COURT
BY: _____
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

DEPARTMENT 304

JACOB RIMLER, GIOVANNI JONES, on behalf
of themselves and others similarly situated and in
their capacities as Private Attorney General
Representatives,

                    Plaintiff,

     v.

POSTMATES, INC.

                    Defendant.

Case No. CGC-18-567868

ORDER DENYING PLAINTIFFS' MOTION
FOR PRELIMINARY APPROVAL OF
CLASS SETTLEMENT

11

12

13

14

15

16

17

18

19

20

21

22

<u>INTRODUCTION</u>

      This matter first came before this Court for hearing on November 22, 2019. Plaintiffs submitted

on the tentative and the hearing was continued to January 31, 2020 for supplemental filings. (Nov. 26,

2019 Order, 1.) Plaintiffs' timely filed their Supplemental Brief on January 21, 2020. On the Courts'

own motion, the January 31, 2020 hearing was continued to March 26, 2020, but due to COVID-19 a new

hearing date of April 29, 2020 was set. In advance of the hearing, the Court issued its tentative ruling,

which stated that it was inclined to continue the motion for further supplemental briefing. Plaintiffs

responded by filing a Further Supplemental Brief the day before the hearing. At the conclusion of the

- 1 -

hearing, Plaintiffs stated that a revised settlement agreement and notice would be forthcoming, at which point the Court noted, the matter would be taken under submission and a final order issued. (See May 5, 2020 Order After Hearing.)   The May 5, 2020 order underscored some of the Court's concerns it raised in its tentative, including the settling of the PAGA claim for minimal value. (Id. at 1-2.)  The Court invited the parties to make additional changes they saw fit that were not included in their Further Supplemental Brief and explain these changes in a declaration. (Id. at 2.)  Thereafter, the parties re-negotiated for more than a month, submitting their revised settlement agreement and declaration to the Court on June 8, 2020, at which point the matter was taken under submission.

After further review and consideration, the Court denies the motion without prejudice.  For the reasons explained below, the Court concludes that the settlement as a whole is not fair, adequate, and reasonable.  Several concerns are set forth below for the parties' consideration should they elect to file a second preliminary approval motion.

## BACKGROUND

A. Procedural History

Initially, the Settlement Agreement at issue covered two lawsuits.  *Rimler v. Postmates, Inc.*, filed as a representative action in San Francisco Superior Court, was brought on behalf of the state of California and other similarly situated who worked for Postmates, Inc. ("Postmates") as couriers in California. (*Rimler* First Amended Complaint, ¶ 1.)  *Rimler* alleged Postmates misclassified its drivers as independent contractors rather than employees.  As employees, couriers would be entitled to the protections of the California Labor Code, including section 2802, which requires that employees be reimbursed for expenses such as fuel, use of their vehicle, and phone/data. (Id. at ¶ 2.)  *Rimler* also alleged Postmates failed to pay the required minimum wage for all hours worked in violation of sections 1194, 1197, and failed to pay appropriate overtime premiums for hours worked in excess of eight per day or forty per week, in violation of sections 1194, 1198, 510, and 554. (Id.)

*Lee v. Postmates, Inc.* was originally filed in San Francisco Superior Court, but removed to the United States District Court for the Northern District of California. (No. 3:18-cv-3421-JCS (N.D. Cal.).)  *Lee* was filed as a putative class action, and similarly alleged that Postmates misclassifies couriers and

- 2 -

1    violated California state and local law, including the Labor Code.  In the *Lee* case, Postmates moved to

2    compel arbitration of the claims of two of the three named plaintiffs, Dora Lee and Kellyn Timmerman.

3    The court granted Postmates' motions compelling arbitration, and plaintiffs filed an appeal to the Ninth

     Circuit.  The claims of the third named plaintiff, Joshua Albert, who had opted out of Postmates'

4    arbitration agreement, were severed into a separate, individual (non-class) PAGA case in the Northern

5    District.  (See *Albert v. Postmates, Inc.*, No. 3:18-cv-7592-JCS (N.D. Cal.).)

          Sometime in July 2019, Postmates and the plaintiffs in *Rimler*, *Lee*, and *Albert* participated in a

6    full-day mediation which led to a global, class-wide settlement agreement which resolved both the PAGA

7    and class claims for individuals who used the Postmates platform as couriers in California between June

8    3, 2017 and October 17, 2019.  Plaintiffs submitted a proposed amended complaint adding the claims of

     Plaintiffs Lee, Timmerman, and Albert to the *Rimler* action and filed their motion for preliminary

9    approval on October 8, 2019.

10        At the April 29, 2020 hearing, Plaintiffs informed the Court that the revised settlement would also

11   include the claims of the named plaintiffs in two additional cases that had been filed against Postmates

     challenging its classification of couriers as independent contractors: *Winns v. Postmates, Inc.*, filed in San

12   Francisco Superior Court, and *Vincent v. Postmates, Inc.*, filed in Alameda Superior Court.  Plaintiffs

13   filed a stipulation to file a new proposed Second Amended Complaint adding not only Lee, Timmerman,

14   Albert, but also Melanie Ann Winns, Ralph John Hickey Jr., Steven Alvarado, Kristie Logan, and

     Shericka Vincent.

15        B.  The Settlement Agreement[1]

16        The Settlement Agreement covers "any and all individuals who entered into an agreement with

17   Postmates to use the Postmates platform as an independent contractor to offer deliver services to

     customers and used the Postmates platform as an independent contractor courier to accept or complete at

18   least one delivery in California" between June 3, 2017 and October 17, 2019.  (Settlement Agreement, ¶¶

19   2.36, 2.43.)  There are approximately 411,671 class members.  (Suppl. Brief, p. 24.)

20   _____

[1] The Settlement Agreement refers to the revised Settlement Agreement filed on June 8, 2020 and
21   attached to the declaration of Shannon Liss-Riordan as Exhibit A (the "Settlement Agreement").

22

Pursuant to the Settlement Agreement, Postmates has agreed to pay $11,968,594. (Settlement Agreement, ¶ 2.44.) This is an increase from the original amount of $11,500,000 agreed to prior to the parties' renegotiation following the April 29, 2020 hearing.[2] Of the $11,968,594, $450,000 will be used for settlement administration, a maximum of $50,000 will be allocated for incentive payments to the named Plaintiffs, $250,000 will be allocated to a dispute resolution fund, and $500,000 will be allocated for Plaintiffs' claims under PAGA, 75% of which will go to the LWDA. (Id. at ¶¶ 2.44, 2.32, 2.35, 2.9, 2.23.) Plaintiffs' counsel is also permitted to seek a fee and cost award of up to 33% of the settlement fund, although counsel will not seek fees on the increased portion of the settlement. (Id. at ¶ 2.38.)

The remaining amount, which is approximately $7.2 million, is for distribution to the class. To receive a payment, a class member must submit a claim form. (Settlement Agreement, ¶ 5.2.) A class member's payment is based on the number of miles driven while using the Postmates application as a courier. (Id. at ¶ 5.7.) Class members will be awarded one point for every estimated mile driven, however, class members who either opted out of arbitration, initiated arbitration, or demonstrate in writing an interest in initiating arbitration against Postmates prior to October 17, 2019, will have their points doubled. (Id.) Assuming a 100% claim rate, Plaintiffs' counsel estimates that 16,675 class members will receive at least $50 (but less than $100) and 13,436 will receive at least $100.[3] (Suppl. Brief, p. 24.) In sum, the majority of class members are slated to receive less than $50 each from the settlement, though no class member who submits a claim form will receive less than $10. (Settlement Agreement, ¶ 5.4.) The parties expect a 50-60% claim rate, which would increase the monetary amount paid to each claimant. (Further Suppl. Brief, p. 12.)

---

[2] This increase includes an additional $250,000 allocated to PAGA, doubling the initial amount from the prior agreement, and $218,594 added to the class portion of the settlement to address the Court's concern that, in negotiating the settlement, the parties had not been able to account for the miles driven by new drivers who did not begin driving for Postmates until after mediation. (June 8, 2020 Liss-Riordan Decl., ¶ 2.)

[3] To place these numbers into context, over 82% of couriers drove less than 500 miles, and over 90% of couriers drove less than 1,000 miles. Of the couriers who drove at least 500 miles, approximately 42% would receive at least $50 and 19% would receive at least $100. Of the couriers who drove at least 1,000 miles, approximately 77% would receive at least $50 and approximately 34% would receive at least $100. (Suppl. Brief, p. 24.)

*Rimler v. Postmates, Inc.*, CGC-18-567868 Order Denying Motion for Preliminary Approval

Although the *Rimler* case was limited to PAGA claims, the Settlement Agreement requires that the Plaintiffs file a Second Amended Complaint to expand the causes of action to include class wage-and-hour claims related to the alleged misclassification of couriers.  (Settlement Agreement ¶ 2.31.)  As for the release, the Settlement Agreement contains an expansive release provision that requires class members to release all claims based on or reasonably related to the misclassification claim.  (Id. at ¶ 2.41.)  Those who submit a claim form for payment also release FLSA overtime and minimum wage claims.  (Id. at ¶¶ 2.1, 2.2.)  The Settlement Agreement also settles all civil penalties potentially due under PAGA, ending all currently pending PAGA litigation against Postmates in other lawsuits.[4]  (Id. at ¶¶ 2.23, 2.41.)  Because PAGA is an action on behalf of the State, the PAGA settlement would prohibit any other courier from bringing a PAGA claim, or obtaining relief through a PAGA representative suit, for the time period up to October 17, 2019, even if that class member opts out of the Settlement Agreement.  (Id. at ¶ 3.8.9.)

## DISCUSSION

### A.  Standard of Review

Before approving a class action settlement, the Court must determine that the terms of the settlement are "fair, adequate and reasonable."  (*Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1801.)  The well-recognized factors that the trial court should consider in evaluating the reasonableness of a class action settlement agreement include "the strength of plaintiffs' case, the risk, expense, complexity and likely duration of further litigation, the risk of maintaining class action status through trial, the amount offered in settlement, the extent of discovery completed and stage of the proceedings, the experience and views of counsel, the presence of a governmental participant, and the reaction of the class members to the proposed settlement  (*Id.*)  There is a "presumption of fairness . . . where: (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small."  (Id. at 1802.)  However where, as here, "the parties negotiate[ed] a settlement agreement before the class has been certified, settlement approval requires a higher standard of

---

[4] See e.g., *Brown v. Postmates, Inc.* (BC712973), *Pettie v. Postmates, Inc.* (RIC817321), *Santana v. Postmates, Inc.* (BC720151), *Altounian v. Postmates, Inc.* (CGC-20-584366).

fairness." (*Roes, 1-2 v. SFBSC Management, LLC* (9th Cir. 2019) 944 F.3d 1035, 1049) (internal citations omitted).) To grant approval, the trial court must "independently [satisfy] itself that the consideration . . . received for the release of the class members' claims is reasonable in light of the strengths and weaknesses of the claims and the risks of the particular litigation." (*Kullar v. Foot Locker Retail, Inc.* (2008) 168 Cal.App.4th 116, 130.)

B. <u>Reasonableness of the Settlement Consideration</u>

1. Maximum Value of the Class Claims and the Settlement Discount

In estimating the maximum recovery, and in reaching the ultimate settlement amount, the primary factor for Plaintiffs' counsel was the couriers' claim for mileage reimbursement. (Motion, pp. 10-11; Oct. 8, 2019 Liss-Riordan Decl., pp. 8-14.) Multiplying the estimated number of miles driven during the claim period by the IRS rate, Plaintiffs' counsel valued the reimbursement claim at $88 million. (Motion, pp. 10-11.) With respect to the other claims for damages contained in the lawsuit, Plaintiffs' counsel assigned minimal to no value. (Oct. 8, 2019 Liss-Riordan Decl., pp. 8-14.) After the Court advised Plaintiffs' counsel to provide the maximum value of all class claims, counsel valued the claim for overtime pay at $1.8 million, the claim for failure to pay minimum wage at $38 million, and the claim for failure to pay sick leave at $2.8 million. (Further Suppl. Brief, pp. 3-5.) Counsel valued the remaining claims for damages, i.e., misclassification, failure to pay wages due at termination, failure to give meal and rest breaks, provide accurate pay records and itemized wage statements, failure to pay reporting time, and failure to post days at zero. (Id.) Thus, counsel's total maximum damages estimate was $130.6 million.

Plaintiffs' counsel then discounted this figure based on risks they believe the class would face, coming up with the settlement figure of $11,968,594, $500,000 of which is being allocated to settle the PAGA claims. Accordingly, the settlement constitutes less than 9% of the verdict value of the non-PAGA claims—i.e., a 91% discount off the full verdict value.

a) Risk to Couriers

According to Plaintiffs, there are general risks with continuing forward that weigh in favor of the settlement. First, there is a risk that the favorable ruling Plaintiffs Rimler and Jones received regarding

-6-

the arbitrability of their PAGA claims would be overturned on appeal, thereby preventing their PAGA claims from being pursued in Court. (Motion, 9.)  Second, although Plaintiffs are confident regarding the merits of their case in light of the *Dynamex* decision, at the time this settlement was negotiated, there remained, and still remains, unanswered questions of whether the decision applies retroactively, and whether it applies to class members' most valuable claim—expense reimbursement for mileage. (Id. at 9-10) (*Dynamex Operations West, Inc. v. Super. Ct*. (2018) 4 Cal.5th 903).)  As for the overtime, minimum wage, and sick leave claims, Plaintiffs claim to face risks achieving class certification and establishing what constitutes compensable time. (Id. at 9-10; Oct. 8, 2019 Liss-Riordan Decl., ¶¶ 23, 26, 38.)

First, while *Dynamex* certainly adopted a more favorable test for distinguishing between employees and independent contractors, that is not to say that the factors under *Borello* would not support a finding of employer misclassification and recovery for expense reimbursement.  Second, while Plaintiffs' counsel asserts that there would be significant issues in proving what constitutes compensable time, the motion stops short of explaining what those issues are. (See Oct. 8, 2019 Liss-Riordan Decl., ¶¶ 23, 26, 27.) Lastly, while Plaintiffs may face risks in both their ability to maintain class certification and on the merits, Postmates, too, faces the risk of losing on the misclassification question which would be of enormous consequence.

In sum, the Court is not independently satisfied that the relatively low amount of monetary relief afforded by the settlement is adequate for the release of the non-PAGA claims. (See *Kullar v. Foot Locker Retail, Inc.*, supra, 168 Cal.App.4th 116, 130.)

C. FLSA Release

The Court observes several problems with the settlement's release of FLSA claims, which were never pleaded by any of the Plaintiffs in their respective complaints and pleaded for the first time in the proposed Second Amended Complaint.  As a general rule, courts disfavor settlement release provisions that go "beyond the scope of the present litigation." (*Haralson v. U.S. Aviation Services Corp*. (2019) 383 F.Supp.3d 959, 967-968) (citing *Terry v. Hoovestol, Inc.*, No. 16-CV-05183-JST, 2018 WL 4283420, at *5 (N.D. Cal. Sept. 7, 2018).)

First, although the preliminary approval motion portrays this case as a class action, the settlement

- 7 -

1    releases FLSA claims Plaintiffs seek to add for the first time in an amended complaint.  (See Proposed

2    Second Amended Complaint, ¶¶ 72, 73.)  These claims have never been a part of this litigation or the

3    litigation in *Lee, Winns,* or *Albert*.  As a result, the Court finds the release of FLSA claims overbroad and

     improper.  (See *Stokes v. Interline Brands, Inc.*, No. 12-CV-05527-JD, 2014 WL 5826335, at *4 (N.D.

4    Cal. Nov. 10, 2014) ["The complaint says nothing at all about FLSA claims and yet the release purports to

5    give away class members' rights under the statute. That is wholly unacceptable."].)  The Court also notes

     that a number of district courts have rejected attempts by plaintiffs moving for approval of a settlement to

6    amend their complaints to add previously un-litigated FLSA claims.  (See, e.g., *Gonzalez v. CoreCivic*

7    *Tenn., LLC*, No. 1:16-cv-01891-DAD-JLT, 2018 WL 4388425, at *4-5 (E.D. Cal. Sept. 13, 2018) ["In the

     court's view, this approach raises red flags in large part because it appears plaintiff agreed to settle the

8    FLSA claim before he even consider[ed] litigating it."]; *Maciel v. Bar 20 Dairy, LLC*, No.

9    117CV00902DADSKO, 2018 WL 5291969, at *6 (E.D. Cal. Oct. 23, 2018); *Thompson v. Costco*

10   *Wholesale Corp.*, No. 14-CV-2778-CAB-WVG, 2017 WL 697895, at *7-8 (S.D. Cal. Feb. 22, 2017).

11   Should Plaintiffs seek to amend the *Rimler* complaint to add FLSA claims for settlement purposes,

     Plaintiffs should be prepared to explain why those cases are wrongly decided or distinguishable.

12          Second, FLSA claims brought on behalf of similarly situated individuals are frequently referred to

13   as collective actions, and "settlement of an FLSA claim, including a collective action claim, requires court

14   approval." (*Kempen v. Matheson Tri-Gas, Inc.*, No. 15-cv660-HSG, 2016 WL 4073336, at *4 (N.D. Cal.

     Aug. 1, 2016).)  Some courts have rejected settlements that attempted to skip collective action

15   certification.  (*Haralson v. U.S. Aviation Services Corp.*, supra, 383 F.Supp.3d at 968) (citing *Thompson*

16   *v. Costco Wholesale Corp.*, at *7).)  Here, Plaintiffs' motion does not explicitly request certification of an

17   FLSA collective action, even though it clearly contemplates the existence of a collective action insofar as

     the agreement and notice to the class specify that by signing the Claim Form class members will have

18   consented to join as a party plaintiff to the FLSA claims asserted in the proposed Second Amended

19   Complaint. (Settlement Agreement, ¶¶ 2.5, 2.6.)  More so, as its currently structured, the settlement

20   requires class members to release FLSA claims to benefit from the settlement of the state law claims. As

     a result, "Class Members are assessed a penalty (in the full amount of their share of the settlement) for not

21

                                                    - 8 -

opting-into the FLSA class." (*Sharobiem v. CVS Pharmacy, Inc.*, No. CV139426GHKFFMX, 2015 WL 10791914, at *3 (C.D. Cal. Sept. 2, 2015).  More than one court has questioned the legality of this opt in structure. (See e.g., *id.; Haralson v. U.S. Aviation Services Corp.*, supra, 383 F.Supp.3d at 969.)

D. PAGA

Plaintiffs' seek to settle the PAGA claim for $500,000. (Settlement Agreement, ¶ 2.23.) Most recently, Plaintiffs estimated that the PAGA claim could result in penalties of $2.7 billion. (Further Suppl. Brief, pp. 6-7.) Yet, Plaintiffs propose settling the PAGA claim for 0.019% of its estimated full worth. The Court is cognizant that even if a verdict were rendered for PAGA plaintiffs, a penalty of over $2 billion would likely be reduced. (See *O'Connor v. Uber Technologies, Inc.* (2016) 201 F.Supp.3d 1110, 1133; Cal. Lab. Code § 2699(e)(2).)  Nonetheless, Plaintiffs have failed to justify settling the PAGA claim for a meager value.[5]

In reviewing a settlement that includes both a class and a PAGA claim, the Court must closely examine both aspects of the settlement.  Plaintiffs suggest the Court take a "sliding scale" approach in evaluating the adequacy of the settlement of the PAGA claim, by taking into account the value of the settlement as a whole. (Suppl. Brief, p. 7.)  *O'Connor v. Uber Technologies, Inc.*, supra, 201 F.Supp.3d at 1134-1135 is illustrative on this point.  There, the court noted that if, for example, the settlement for the class is robust, the purposes of PAGA may be concurrently fulfilled. ( *O'Connor v. Uber Technologies, Inc.*, supra, 201 F.Supp.3d at 1134.)

> By providing fair compensation to the class members as employees and substantial
> monetary relief, a settlement not only vindicates the rights of the class members as
> employees, but may have a deterrent effect upon the defendant employer and other
> employers, an objective of PAGA.  Likewise, if the settlement resolves the
> important question of the status of workers as employees entitled to the protection
> of the Labor Code or contained substantial injunctive relief, this would support
> PAGA's interest in augmenting the state's enforcement capabilities, encouraging
> compliance with Labor Code provisions, and deterring noncompliance.

---

[5] Plaintiffs valued the willful misclassification PAGA claim at $1.88 billion. (Further Suppl. Brief, p. 7.) Plaintiffs claim that it is quite likely that they would be unable to establish any willfulness on the part of Postmates, which would result in the possibility that Plaintiffs would not recover any PAGA penalties based on willful misclassification.  Even if the Court were not to take into account the $1.88 billion, Plaintiffs would still be settling the remaining penalties for less than 1%.

- 9 -

1    (*Id.* at 1134-1135) (internal quotations omitted).)  On the other hand, where the compensation to the class

2    is relatively modest when compared to the verdict value, there is no non-monetary relief to the class, and

     the settlement does nothing to clarify the status of couriers as employees versus independent contractors,

3    the settlement of the non-PAGA claims does not substantially vindicate PAGA. (See *id.* at 1135.) "In

4    these circumstances, the adequacy of settlement as a whole turns in large part on whether the PAGA

5    aspect of the settlement can stand on its own." (*Id.*)

6        Here, the Court does not find the PAGA settlement is fair and adequate.  The risks at issue rest

     primarily on the merits of couriers' labor code claims and the discretionary reduction of statutory

7    penalties.  However, those risks are not limited to Plaintiffs.  PAGA claims cannot be compelled to

8    arbitration. (See *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348.)  Thus, the

     employment classification question could still be decided by this or another court in the adjudication of

9    the PAGA claim.  Postmates takes on a significant risk that should a representative PAGA claim be

10   litigated and adjudicated, it could lose on the question of misclassification and such an adverse judgment

11   would carry not only a direct monetary penalty, but potentially could affect other litigation including

12   arbitrations. (See *O'Connor v. Uber Technologies, Inc.,* supra, 201 F.Supp.3d at 1135.)  Given that this

     case was filed as a PAGA action, Plaintiffs appear to treat the PAGA claim simply as a bargaining chip to

13   induce Postmates to agree to a settlement with the class.

14       E.   Other Concerns

             1.   Dispute Resolution Fund

15       The Court continues to have concerns regarding the Dispute Resolution Fund.  Plaintiffs explain

16   the separate allocation of funds is to be used to (1) resolve any bona fide disputes that may arise regarding

     the calculation and disbursement of Individual Settlement Payments, and to (2) disburse Individual

17   Settlement Payments to individuals mistakenly excluded from the Settlement Class by the parties. (Suppl.

18   Brief, pp. 9-10; Settlement Agreement, ¶ 2.9.)  Pursuant to Plaintiffs' Supplemental Brief and the revised

19   Settlement Agreement, individuals who believe they have been inadvertently excluded as class members

     must notify the settlement administrator within 30 days after the initial notice is given. (Suppl. Brief, p.

20   17; Settlement Agreement, ¶ 6.11.) These individuals are subject to the same 60-day deadline to opt-out,

21                                                    - 10 -

22

object, or submit a claim, and are not provided any additional time. (Suppl. Brief, p. 17.) Thus, it is not clear the purpose of paying these individuals from a separate fund when they are under the same obligations as any other member of the class, and will be provided their Individual Settlement Share under the same distribution time-frame.

There is a second issue regarding the Dispute Resolution Fund, and that is that the Settlement Agreement states that payments to excluded individuals "shall be disbursed from the [fund], as long as sufficient money is left in the Dispute Resolution Fund." (Settlement Agreement, ¶ 6.11.) In its Order, the Court asked Plaintiffs what would happen if there were insufficient funds for an excluded individual to get paid. (Nov. 26, 2019 Order, 3, 5.) In response, counsel states that "as long as such an individual made themselves known prior to final disbursement, funds remaining from uncashed checks could also be used as a source of payment." (Suppl. Brief, p. 17.) This proposal—that inadvertently excluded individuals have until final disbursement of funds to "make themselves known"—is contrary to the 30-day deadline after initial distribution of notice to notify the Settlement Administrator of their identity. (Settlement Agreement, ¶ 6.11.) As for the fund being used to resolve any bona fide disputes regarding the calculation of payment owed, presumably class members will contact the settlement administrator once they receive their Notice and dispute their miles prior to the disbursement of funds. It is unclear, therefore, why the Dispute Resolution Fund is necessary.

2. Claim Form

In their Supplemental Brief, counsel states: "Notwithstanding the formal 'bar date' the parties will allow claims to be submitted as long as it is feasible prior to distribution. (Suppl. Brief, p. 7.) In the Further Supplemental Brief, counsel states that this practice ensures that class members can submit claims as late as possible, even if they submit their claims after final approval. (Further Suppl. Brief, p. 12.) If this is the case, this agreement between the parties is at odds with the 60-day deadline imposed on class members to submit valid claim forms. (See Settlement Agreement, ¶¶ 5.3, 5.4.) It is also not outlined anywhere in the Settlement Agreement or Notice. If the parties are concerned with the 60-day deadline, they should increase the amount of days a class member has to submit their claim form. No claims should be paid out after the Court grants final approval.

- 11 -

3. Service Award

As for the settlement's use of the service award as consideration for a general release, Plaintiffs' counsel contends that courts commonly find that such service awards are appropriate consideration for a general release. (Suppl. Brief, p. 25.) This contention is unsupported and counsel's attempt to distinguish *Roes, 1-2 v. SFBSC Management, LLC*, supra, 944 F.3d 1035 is unavailing. (See Further Suppl. Brief, p. 2.) Incentive awards are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." (*Cellphone Termination Fee Cases* (2010) 186 Cal.App.4th 1380, 1394) (citing *Rodriguez v. West Publishing Corp.* (9th Cir. 2009) 563 F.3d 948, 958).) While Plaintiffs may sign a broader release, there is no good reason the service award should be tethered to a general release. The parties should remove this language from the Settlement Agreement.

### CONCLUSION

For the reasons stated above, the settlement as a whole as currently structured is not fair, adequate, and reasonable, and therefore, the Court denies Plaintiffs' motion for preliminary approval. The Court, however, encourages the parties to continue settlement negotiations in hopes that they are able to present another agreement for preliminary approval that is otherwise consistent with this order.

IT IS SO ORDERED.

Dated: June 16,2020

Anne-Christine Massullo
Judge of the Superior Court

- 12 -

## CERTIFICATE OF ELECTRONIC SERVICE
(CCP 1010.6(6) & CRC 2.251)

I, Ericka Larnauti, a Deputy Clerk of the Superior Court of the County of San Francisco, certify that I am not a party to the within action.

On June 17, 2020, I electronically served the attached document via File & ServeXpress on the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

Dated:  June 17, 2020

T. Michael Yuen, Clerk

By:  _____
Ericka Larnauti, Deputy Clerk